# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) Case No. | 2:21-mj-0101 DB |
| CARLOS VILLASENOR | ) | |
| | ) | |
| *Defendant(s)* | ) | |

**FILED**
Jun 18, 2021
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 1 through June 17, 2021 in the county of El Dorado in the Eastern District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 7 U.S.C. § 2156(b) | Possession of an Animal for Participation in an Animal Fighting Venture |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

/s/ Anitra Mackie
*Complainant's signature*

Anitra Mackie, Special Agent,
U.S. Department of Agriculture - OIG
*Printed name and title*

Sworn to me and signed via telephone.

Date: June 18, 2021

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE
Deborah Barnes, U.S. Magistrate Judge
*Printed name and title*

City and state: Sacramento, California

# AFFIDAVIT OF SPECIAL AGENT ANITRA MACKIE
# IN SUPPORT OF COMPLAINT

I, Anitra Mackie, being duly sworn, depose and state as follows:

## I. AGENT BACKGROUND

1. I am a Special Agent (SA) with the U.S. Department of Agriculture (USDA), Office of Inspector General (OIG) – Investigations, Sacramento, California, and have been so employed since August 2011. As an OIG SA, my duties include investigating allegations of criminal activity, waste, abuse, issues that affect the health and safety of the public, and serious employee misconduct in the programs and operations of the USDA. I am also responsible for coordinating with Federal, State, and local law enforcement agencies, as appropriate. I have participated in numerous criminal investigations, execution of Federal and State search warrants, and the seizure of evidence, including evidence of potential violations of 7 U.S.C. § 2156, Animal Fighting Venture Prohibition Act (AFVPA). As part of my duties as a USDA-OIG Special Agent, I investigate matters involving illegal animal fighting. I have participated in investigations involving illegal animal fighting, and I have received specialized training in the investigation of animal fighting and related Title 18 offenses. Through training and through investigations of persons involved in animal fighting offenses, I am familiar with the actions, traits, habits, and terminology utilized by handlers or owners of dogs involved in animal fighting ventures. I have worked with confidential human sources to gather information and evidence related to animal fighting, to include dogfighting. I have also consulted with other USDA-OIG SAs who have special training and experience related to animal fighting offenses.

2. Based on the facts set forth in this affidavit, I submit there is probable cause to believe that Carlos Villasenor committed violations of 7 U.S.C. § 2156(b), relating to participation in an animal fighting venture. The Federal Animal Welfare Act defines an "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(b)

prohibits knowingly selling, buying, possessing, training, transporting, delivering, or receiving any animal for purposes of having the animal participate in an animal fighting venture.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the criminal complaint and requested arrest warrant and does not set forth all of my knowledge about this matter.

## II. OVERVIEW OF DOG FIGHTING

4. Dog fighting typically involves pit bull-type dogs that are released by their owners or handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

5. Prior to a dog fight, dog owners or handlers may enter into an agreement with their opponent, often referred to as a "match," "fight," or "show." The owners or handlers may agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

6. Dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

7. Dog fighters often take steps to house fighting dogs away from public view, such as by placing them inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

8. "Champion" or "Grand Champion" status refers to a dog who has won three or five fights, respectively.

9. Dog fighters may keep multiple dogs at a time in order to maintain a stock of dogs at different weights and both sexes for dogs to be matched for a fight according to weight and sex; to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog

fighting bloodline; and to have a sufficient number of dogs to fight dogs more than two to three times a year.

10. Finding an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year is known as "calling out a weight." Dog fighters often "call out a weight," by telephone, text, or e-mail, to known dog fighters in several states, to increase their odds of finding a match.

11. Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked" or set up. The dog then typically undergoes a conditioning process. Dog handlers often refer to this conditioning process as putting the dog "in a keep." This "keep" may involve treadmills to run and exercise the dogs away from public view; weight pulls to increase the dog's strength and stamina; "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs (such as steroids), vitamins, and other medicine. "Animal pelts" are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

12. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches.

13. Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries. Dog fighters also use veterinary supplements and pharmaceuticals to enhance fighting dogs' stamina and to keep injured dogs fighting longer.

14. Although dogs used for fighting are often housed outside, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before an upcoming match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

15.     It is common for those operating dog fighting ventures to maintain pedigrees, books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and training of fighting dogs. These materials may be kept in both hard and electronic copy.

## III. THE POSSESSION OF DOGS BY DEFENDANT CARLOS VILLASENOR FOR USE IN AN ANIMAL FIGHTING VENTURE

### A. USDA-OIG's Undercover Contacts with VILLASENOR

16.     In May of 2021, as part of an investigation into dog fighting activity by VILLASENOR, your affiant arranged through an intermediary to purchase a dog from VILLASENOR.  As payment for the dog, your affiant mailed two money orders totaling $1,500 in value to VILLASENOR's address in Placerville, California.

17.     On May 17, 2021, your affiant and another law enforcement agent, acting in an undercover capacity, went to VILLASENOR's property in Placerville to pick up the dog. VILLASENOR gave the dog to the agents and engaged in conversation about his property and the dog. Afterwards, the dog was removed from the property by the agents and was subsequently transferred to El Dorado County Animal Services (EDCAS) to receive care and evaluation.

18.     On May 18, 2021, MACKIE received a veterinarian report from EDCAS regarding the dog purchased from VILLASENOR on May 17, 2021, and transferred to their facility. A physical exam was completed on the dog, and the exam results included:

  a. Approximately 1-year-old
  b. Weight 46 pounds
  c. Alopecia on ventral neck, bilateral axillary, and forehead (especially right side) regions; Possible Demadex
  d. Thick collar was too tight
  e. The "most remarkable results were elevated Eosinophils (could indicate flea infestation); elevated Creatine Kinase (could indicated muscle damage); and positive for the Giardia Antigen."
  f. Possible "peppering," on top of the dog's head, which could indicate another animal biting on his head.

19. Based on my training and experience, in addition to my conversations with other law enforcement agents, I know that dogs who have been recently fought or who are being trained to fight may show elevated Creatine Phosphokinase (CPK) as a result of extreme exercise and stress. They may also be suffering from blood loss, dehydration, and shock. Veterinary reports from examination of fighting dogs indicate that parasites are common, including heartworms, tapeworms, hookworms, roundworms, coccidian, and Giardia.

20. Doctors cleaned the dog with a medicated bath and prescribed specific medication, vaccines and treatments to address the dog's health issues, including but not limited to the skin irritation and Giardia.

21. On June 9, 2021, your affiant, acting in an undercover capacity, contacted VILLASENOR via the Telegram messaging application. During the conversation, I asked VILLASENOR about purchasing a puppy. VILLASENOR told me that he had a litter of puppies that included three males; two VILLASENOR was keeping, and one was reserved for another customer. VILLASENOR and I agreed that he would sell me a female puppy for $700. He stated that he recently sold a female puppy for $1,000, but would give me a deal on the puppy. I asked VILLASENOR for the pedigree on the puppies, which he sent via a link to an online pedigree website. The title of the pedigree was **ONLINE PEDIGREES [748420] SIC WE STILL SCRATCHING**. I went to the pedigree link provided by VILLASENOR and read the caption, "*We couldn't do this one with pop's so we did it with his clone; I'm confident this boy will carry the torch.*" VILLASENOR told me that this was "s*ome of the best Eli Lil Gator to be had; don't let this stuff out in the bay, they my rivals.*" He further stated, "*They going to try to breed to it; I don't sell nothing on the west, usually.*" Through my training, experience, and discussions with other law enforcement agents, the "*Eli Gator*" dog bloodline is known for originating from dog fighting bloodlines, and is considered highly desirable among dog fighters for the strength and agility observed in dogs produced from this bloodline. I understand VILLASENOR's statements to mean that he does not want rival dog fighters in the Bay Area to gain access to his dogs and their desirable fighting pedigrees for breeding purposes.

B. **Pit Bull-type Dogs and Dog Fighting Paraphernalia at Defendant Carlos**

**VILLASENOR's Residence**

22. On June 17, 2021, law enforcement officers executed a search warrant at VILLASENOR's property in Placerville, California (the "Residence") where VILLASENOR resides.

23. During the search of the Residence, law enforcement officers seized twenty-seven live pit bull-type dogs. Approximately half of the dogs were housed on heavy chains attached to small cylindrical huts or trees, spread throughout the property. The dogs were spaced so that they could see one another, but not reach one another. Two additional dogs were housed individually in crates located in the garage. One dog who had recently birthed a litter of puppies was housed behind the residence in an outbuilding, along with nine puppies.

24. In addition to the pit bull-type dogs, a small chihuahua mix was housed in a separate crate in the garage, along with the two pit bull-type dogs described above. In my training and experience, small dogs are sometimes used as "bait dogs" to encourage or train fighting dogs to attack without incurring any risk of injury to the fighting dog.

25. At least one of the dogs had scars on its face consistent with injuries inflicted by another dog.

26. In addition, many of the dogs had an untreated skin condition, tentatively diagnosed at the scene as demodex infestation. At least one dog also had a serious case of conjunctivitis, an infection of the eye.

27. Inside the Residence and inside outbuildings on the property near where the dogs were found, law enforcement officers seized the following:

   a. A stand often called a "rape rack," designed to hold a female dog and immobilize her while a male dog mounts her. The device is used where the female dog is too dog-aggressive to mate otherwise;

   b. Three treadmills, which are used to exercise and train dogs prior to a fight to build strength and endurance, and/or to bring them to or maintain fighting weight;

   c. Plaques for "Best in Show" or "B.I.S." awards from "Convencion Mexicali" in 2020 and 2021.

   d. Veterinary medications (including antibiotics and anti-worm medication), a skin stapler, syringes, and IV bags;

6

e. Testosterone boosting supplements, which are often used by dog fighters to increase muscle mass and aggression of dogs before a fight;

f. Hides made of or resembling animal skin, which are used by dog fighters to develop a dog's jaw strength and pulling strength;

g. Break sticks, which are used to pry open a dog's mouth in order to release a hold that the dog has on another dog;

h. A hanging scale, also called a "crane scale," capable of measuring up to fifty pounds, which is used to weigh dogs before a dog fight.

28. According to PayPal records obtained and reviewed by your affiant, as well as information printed on the packaging, several of these medications and instruments were purchased from sellers located outside of California.

C. **Defendant Carlos VILLASENOR's Dog Fighting Pedigrees at the Residence**

29. Dog fighters use pedigrees showing the bloodlines from which dogs are bred to prove and verify the lineage of their dogs or dogs they are fighting against or considering buying or breeding to. The pedigree for each dog typically contains: an indicator of how many fights the dog has won, whether the dog is a "Champion" or a "Grand Champion," the breeding history of the dog going back four generations, and indicators of the number of fights that dogs in their bloodline have won. There is also a field for "Breeder" and "Owner."

30. Law enforcement officers seized from VILLASENOR's residence the pedigree of a dog named "Miss Easy," bearing the seal of American Dog Breeders Association Inc. The pedigree is dated February 17, 2009, and lists "Carlos Villasenor" as the dog's owner. The pedigree lists Miss Easy's ancestry going back six generations, which includes dogs from known dog fighting bloodlines like "Little Gator" (an apparent reference to the "Eli Gator" bloodline) and "Chucho." The pedigree also contains handwritten notes for many of the dogs, including the notations "ROM," "[1, 2, or 3]XW," and "[number] min." From my training and experience, I understand "ROM" to stand for "Register of Merit," which refers to a dog who produces "Champions." I understand a number followed by "XW" to indicate the number of dog fighting matches the dog has won, and I understand a number followed by

"min." to indicate how many minutes it took the dog to win its match by killing or injuring the other dog so badly that it cannot continue to fight.

## CONCLUSION

31. Based on the aforementioned factual information, I respectfully submit that there is probable cause that CARLOS VILLASENOR committed the following offense:

**COUNT ONE** – Possession of an Animal for Participation in an Animal Fighting Venture

In or around June 2021, CARLOS VILLASENOR knowingly possessed a dog for purposes of having the dog participate in an animal fighting venture, namely, an event, in or affecting interstate or foreign commerce, that involved a fight conducted or to be conducted between at least two animals for purposes of sport wagering, or entertainment, in violation of 7 U.S.C. § 2156(b).

I swear, under penalty of perjury, that the foregoing information is true and correct, to the best of my knowledge, information and belief.

/s/ Anitra Mackie
Anitra Mackie
Special Agent
U.S. Department of Agriculture - OIG

Subscribed and sworn before me telephonically 18th day of June, 2021.

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

/s/ Mira Chernick
Approved as to form by AUSA MIRA CHERNICK